IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 5, 2018

## SANDRA JO ROBBINS v. ROBERT SCHOLZE ROBBINS

**Appeal from the Circuit Court for Hamilton County**
**No. 16D385     L. Marie Williams, Judge**

_____

### No. E2017-01427-COA-R3-CV

_____

This appeal arises from a divorce. Sandra Jo Robbins ("Wife") sued her husband Robert Scholze Robbins ("Husband") for divorce in the Circuit Court for Hamilton County ("the Trial Court") after approximately 20 years of marriage. Following trial, the Trial Court divided the marital estate, entered a permanent parenting plan regarding the parties' minor children Ava and Theodore ("the Children"), and awarded Wife alimony in futuro. Husband appeals to this Court, raising a host of issues. We hold, *inter alia*, that the Trial Court erred in excluding Husband, pro se, and Wife's attorney from in-chambers questioning of the Children. However, we hold further that, considering the whole record, this error by the Trial Court was not reversible error. We, therefore, affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Robert Scholze Robbins, pro se appellant.

Jennifer H. Lawrence and David H. Lawrence, Chattanooga, Tennessee, for the appellee, Sandra Jo Robbins.

# OPINION

## Background

Wife obtained an order of protection against Husband following a February 2016 domestic violence incident. Wife sued Husband for divorce in the Trial Court. The parties had been married some 20 years. Three children were born of the marriage: Katherine, born 1997, of majority age and not at issue in these proceedings; Ava, born in 2001; and Theodore, born in 2002. Husband was an investment manager and the primary financial provider for the family. Wife predominantly was a stay-at-home mother. Disputes between Husband and Wife over carrying the financial burden of the family contributed strongly to the breakdown in the marriage. In August 2016, the Trial Court authorized Wife to relocate with the Children from Chattanooga, Tennessee to the Spring Lake area of Michigan, where Wife has family. All remaining issues were heard in the final hearing, taking place on February 24 and March 29, 2017.[1] Husband and Wife were the main witnesses at trial, and we quote from their testimony as pertinent to the issues on appeal.

Wife testified, in part, as follows:

Q. So you're how old?
A. Almost 60. I'm 59.
Q. Okay. All right. Do you have any Social Security earnings separate and apart to draw on?
A. Not at this time, no.
Q. And during the history of the marriage, did you work outside the home?
A. No. He wanted me to be an at-home mom. I did dabble a little bit in real estate and had some minor income, but that was about it.
Q. And that shows on the tax return?
A. That's correct.
Q. Very minor?
A. Uh-huh, yes, very minor, over the 20-year marriage.
Q. Before you-all married, did you have a job?
A. Yes. I had a thriving, great job with a law firm. I was a senior litigation paralegal.
Q. And did you give that job up?
A. I did.
Q. Why?

---

[1] Judge W. Jeffrey Hollingsworth originally presided in this case before recusing himself. Judge L. Marie Williams presided by the time of the final hearing.

A. He wanted me to give it up to raise the children.

Q. During the marriage, what's the most you've ever made?

A. I think $7,000 in one year.

Q. Okay.

A. I did a lot of community stuff with the children. I was always the room mom, and I was totally involved with the kids and their school. And I sat on the preschool board. I taught Sunday school. I was a football mom. I got plaques from the football players for being such a great team mom. And I took the kids back and forth to the volleyball games, and I was a volleyball mom. And I helped teachers, I went in and assisted with the teachers, and helped with the kids, and graded papers. So I was really quite busy with everything for the children and at the school. And then I raised a lot of money for the Episcopal school that they went to, tens of thousand of dollars I was responsible for raising for the school. So I worked very hard for the children in their lives at their school.

Q. And was this when the family lived in Atlanta?

A. Yes, ma'am.

Q. Okay. As far as raising money for the Episcopal school?

A. Correct.

Q. When did you and the family move to Chattanooga?

A. In 2000 -- 2013, about 2013, when Katherine was a freshman at Baylor.

***

Q. So, since you-all moved to Michigan, which was about when?

A. August, September of 2016.

Q. Okay. And so they've been up there a little over a year?

A. No.

Q. No, I'm wrong. How long?

A. Six, seven months.

Q. That's right. Okay. How are their grades since they moved?

A. Great. Ava's straight A's; and Theo, he was straight A's, too. The last report card I think he got one B, but, you know, he was involved in a big project at school.

Q. He's in what grade?

A. He's in ninth grade.

Q. Okay. Ava's in what grade?

A. Tenth grade.

Q. Are they close?

A. Now they are, yes, very.

Q. And I think we've already gone through, you've got family there?

-3-

A. Yes.

Q. Okay. And how's the school system, in your opinion?

A. It's great. It's a great school. Theo loves it. He's -- he -- it's the same colors as Baylor. And he -- he's, you know, quite an athlete, and they love him there. And he got to know a lot of the football players in August, when they had the pre-football schedules. And so he kind of stepped right into high school with some really great football friends, and so he's loving it. Ava, of course, is like the -- she speaks French very good, and she's kind of like the teacher's pet, the French teacher's pet, and she wanted her to head up the French club. And so they've been pretty -- they've been very embraced at the school.

Q. Is there anything vindictive whatsoever on your part as far as the children being in Michigan?

A. None whatsoever.

Q. Financially could you have made it if you'd stayed in Chattanooga?

A. No.

Q. Couldn't make it now except for family, right?

A. That's correct. I really rely on family.

Q. Okay. In your opinion, is it reasonable for the children and you to be in Michigan?

A. Yes.

On cross-examination by pro se Husband, Wife testified as follows:

Q. Do you realize that separation from my children is a big negative to my health and motivation?

A. You created it.

Q. Answer the question, please.

A. Ask the question again, please.

Q. Do you realize that separation from my children is a big negative to my health and motivation?

A. I don't know that.

Q. Do you realize that not being able to play my favorite sport, an aerobic sport of tennis, is a big negative to my health?

A. I don't know that.

Q. Did I ever tell you how important tennis was to my health?

A. No.

Q. Do you agree with me that house arrest is harmful to my business?

A. I don't agree with that.

Q. Do you think it's helpful?

A. I don't -- I don't know.

Q. Under house arrest, I'm not able to go freely to associate with clients, in a business that requires marketing, do you understand that?
A. You never really did that before.

***

Q. Have you found my Italian cufflinks, diamond, gold and onyx, costing $3,000 that we bought together in Italy?
A. I don't have that. I gave you all of your jewelry in your jewelry box like two days after you got out of jail. It had several cufflinks in it and all of your jewelry. I gave you-all of that stuff.
Q. Did you work for ten years as a paralegal with Dallas and Atlanta law firms, including working for a law firm principal John Howard of Smith Howard?
A. Yes.
Q. Did we discuss that you would work -- you would stop work simply because of the early child rearing of our children?
A. Please say that again.
Q. Was the reason for your stopping work that we agreed that child rearing in its early years was more important?
A. You wanted me to be an at-home mom, and you didn't want me to work, and I was planning the wedding, and we were going to conceive right away, and so I was -- that's why I didn't work. And we had three children, and you wanted me to be an at-home mom, which I did. I was devoted to that for 20 years and to this day.

***

Q. Paralegal jobs would have been a strong pursuit for you to help this family out, correct?
A. I don't know what you mean help them out. Financially?
Q. Yes.
A. I had a real estate license, and you didn't want me to work, because you said it would put us up into a higher tax bracket and it was more taxes that we would have to pay.
Q. When did I say that?
A. Continuously throughout the marriage.
Q. So do you recall me emphasizing in many different communications to you over the last five to ten years how critically important it was for you to maximize your income for the family and make $50,000 or more?

A. You've -- you mentioned that to me, but then you'd turn around and tell me to not get a job because it would push us up into another tax bracket. Especially when you were intoxicated at night, you would tell me in derogatory terms to get a job, but then you would apologize the next morning and tell me not to do it, that I needed to stay home and shuttle the children around and attend to their -- help them attend to their school business.

Q. Did I often send e-mails on the most important things about our marriage and family?

A. You sent a lot of e-mails, and they were long, and we didn't -- they were just so voluminous, Bob, everybody kind of avoided them, unfortunately. I'm sorry.

***

Q. Okay. Do you now recall these critical items of the future, of the education of our kids, and the financing of our family?

A. I remember you discussing it, but then you would say, I make $400,000 a year.

MS. LAWRENCE: Which is in the document, you know.

A. I make more money than any doctor, lawyers in recent years.

Q. Did I acknowledge to you that in prior years I had made that much money, but things were going down and we needed to diversify?

A. But then you would tell me they were going up.

Q. Does that say -- is that said anywhere in this e-mail, that our income was going up and we needed to do anything other than an all-out change in the way we were spending and earning?

A. It doesn't say it in this e-mail.

Q. Does the language of this e-mail and all these other mentions about our finances take the form of pleas for your help, as in the last sentence of this e-mail?

A. But then on the other hand you would tell me not to work, to stay with the kids. And it was up and down. And then you would drink at night and tell me not to work, and then tell me to work, and then you -- the next day you would write these e-mails, and then you would drink the next night and say just disregard that. So I never knew which way was up or down. You were in total control of the finances. I had every faith in the world that you were going to handle it, because you're an investment manager, and I don't know much about the money. I complied with everything you asked me to. I continuously checked with you on not spending anything over $100. You

approved it.  I didn't do excess shopping without your permission, and I basically shopped at Walmart.  That's --

Q. Do you buy $3,000 saxophones at Walmart?

A. That was for -- I don't think the saxophone was that much.  It was a used saxophone.

Q. And do you buy $1,300 sofas at Walmart?

A. That was -- you approved that.  You completely approved that.

Q. The next page, third paragraph: Are you going to try to save our marriage and help our family and business finances?

A. Sure.  I was there to try to help.

Q. And the next underlined sentence: We need your real estate business to take off.

A. But then I would do brochures to network and you wouldn't let me buy the brochures.

Husband testified, in part, as follows:

Q. You've read those letters that the children, Ava and Theo, have written about you, haven't you?

A. Yes.

Q. They were chilling, weren't they?

A. It was extremely upsetting to learn that Theo lied to the judge and the district attorney.

Q. So you're still up here today calling your son a liar and you want to be custodial parent?

A. It was also extremely upsetting that Ava could -- well, it's normal.  Kids who have never --

THE COURT: Sir, that wasn't -- sir, the question was a yes-or-no question.  Are you still contending you should be the primary residential parent of your children?

MR. ROBBINS: Yes.

THE COURT: Thank you.

BY MS. LAWRENCE:

Q. Ava, in the letter, called you a drunk, right?

A. Right.

Q. She called you abusive, right?

A. I don't remember that word.

Q. Ava is very, very bright, right?

A. In some respects, yes.

Q. She was an outstanding scholar at Baylor, correct?

A. To the best of my knowledge, when I was separated, she was still an outstanding scholar.

Q. She's soon to be, in a month, 16 years old, right?

A. Correct.

Q. Even in that video, we saw she was yelling at you to stop your behavior, right?

A. Yes.

Q. Your daughter Katherine, who's an outstanding scholar at Michigan State, does not speak with you, does she?

A. That's correct.

Q. Have you seen what she's written to Michigan State about you?

A. No.

Q. You don't remember that hearing we had in front of Judge Hollingsworth about the financial assistance and what was in the file?

A. I don't remember reading her written submission about me in that.

Q. You know that Katherine has strong feelings about how she was abused by you when she was growing up; you know that, don't you?

A. Absolutely not.

Q. Well, do you think Theo has strong feelings about the treatment you've given him?

A. Yes. They were peaceful. Sandra's were violent.

Q. Your interactions with Theo were peaceful?

A. Yes. I never roughed him up. Sandra wanted me to, I wouldn't do it.

Q. What do you call your behavior that day when you were doing what's shown on the video?

A. He hit me in the neck, as I said on the video. I didn't touch him, as I recall.

Q. All that screaming, is that how you usually handle these children?

A. I was in pain after surgery.

THE COURT: Sir, answer yes or no, and then you may explain.

A. What was the question?

MS. LAWRENCE: Would you read it back?

(Whereupon, the court reporter read back the last question.)

MR. ROBBINS: No.

BY MS. LAWRENCE:

Q. Now, against my better judgment, I'm asking you a question that I'm sure you'll elaborate on. From a realistic standpoint, how do you think you get integrated back into these children's lives? You certainly don't think it's like -- even if the order of protection was only extended another year, you don't just show up and they welcome you. How do you really think, realistically, you're going to get integrated, if ever, with these children?

***

A. … The same way I've wanted to for the last 14 months, counseling.

Q. Well, what would you do, drive up to Michigan and try to have some counseling?

A. No. I can't afford business and personally to be driving up for frequent visits like that. Ideally we would need to do it frequently, I think, to resolve this quickly, in their interest, and a counselor here, by way of telephone, I think, is the -- would have to be most of them. Perhaps I would drive halfway to see them after that, and hopefully have a rapid reconciliation of what I feel is a temporary problem, with Sandra having rejected me and poisoned their attitudes towards me. I was a great father to them.

Q. Mr. Robbins, what parent in the world, if given the opportunity, wouldn't bother to drive to Michigan, when you say it would be too much inconvenience for you? You don't really want to reconcile with these children, do you?

A. I'm happy to go to Michigan any day that I need to and spend a little time up there, but realistically, I've got to maintain a business. I'm the overwhelming breadwinner of about 85 percent of this family's income, and I can't just be doing that easily on the road or in Michigan.

***

Q. Well, let's just speed this on. Let me show you the letter. You've read this letter, haven't you, where Ava says all these things about you?

A. Yes.

Q. Okay. That also is chilling, isn't it?

A. It was a chilling letter, yes. It was -- it was very upsetting to me to -- to read this and to understand that she was so upset.

Q. Must have made you feel horrible, right?

A. Well, kids will do things that, you know, reflect a limited understanding. She doesn't understand the difference between having a couple of drinks and being drunk. I told them exactly what was going to happen, and it was with a heartfelt earnest plea that I was pleading for everyone to work together as this family to achieve their dreams of Baylor and whatever else. No one was cooperating.

With respect to his finances, Husband testified as follows:

Q. How Robbins Capital Management works is that it's a Georgia Subchapter S corporation, right?

A. Correct.

Q. Okay. And you are the sole shareholder?

A. Correct.

Q. Okay. And what you do on the tax return is your accountant puts the gross receipts -- for example, 2015, the gross receipts were $139,720, right?

THE COURT: Ms. Lawrence, bring it down so you can see the date.

A. Okay. Yes.

Q. And I can give you a copy. I think I have an extra copy. All right. Here's your copy so you don't have to strain.

A. Thank you.

Q. Let me turn to the same page. How the Subchapter S works is that the business expenses are taken off within the return, correct, the Robbins Management Company, that's where you see the --

A. Correct.

Q. Okay. So what happens then is that they put down the gross receipts, then they -- you take compensation of 40,000, right?

A. It may have been 40,000 that year. I recall 30, though.

Q. Okay. Well, it says 40.

A. Okay.

Q. Number 7.

A. Yes, ma'am.

Q. All right. And then there's total deductions of 56,000, and that's where we see all the business expenses. They're within this Subchapter S tax return. They're not on your personal tax return, are they?

A. I think that's correct.

Q. Well, you know it's correct. I mean, aren't you a graduate of Dartmouth?

A. I am.

Q. Okay. And didn't you testify last time that you have accounting knowledge so that you can read these financial statements?

A. Yes.

Q. Okay. So you know exactly what happens with Robbins Management. You get a $40,000 compensation, then after all the expenses are taken, then there is ordinary business income, right?

MR. ROBBINS: Objection, Your Honor. She's adopting an attacking tone of voice. I don't have those numbers in my mind, and I don't recall all of them and absorb them, you know, present all of them very quickly. I do my best.

THE COURT: The objection is overruled.

BY MS. LAWRENCE:

Q. Here is your tax return of 2015.

A. Yes.

Q. All right. And if my questions are too complicated, you let me know. Okay?

A. Okay.

Q. All right. You have it in front of you, 2015, where Robbins Capital Management had gross receipts of $139,720, right?

A. Yes.

Q. And those are what you get from being the sole owner of Robbins Capital Management, Inc., right?

A. Yes.

Q. Okay. And then there is compensation to officers. You're the only officer, right?

A. Yes.

Q. Okay. So you pull 40,000 out per year before you pull the ordinary business income, right?

A. Yes.

Q. Okay. And so to get your true salary we need to add your compensation of 40,000 plus the income of Robbins Capital Management at $82,944, right?

A. Yes.

Q. Uh-huh. And if you add 40,000 to $82,944, that's $122,944, right?

A. Yes.

Q. Which, if you divide it by 12, gets you almost to the penny what you filed in October of 2016, with a very accomplished lawyer, as to having gross wages monthly of $10,666, right?

A. Yes.

Q. Okay. And all these expenses that you now have put on this income and expense statement that you bring up here, those are already expenses that are being pulled for the most part from the corporate tax return. That's where we see these expenses of $56,776, right?

A. Right. A lot of these numbers have changed since 2015.

Q. Uh-huh. Well, when I took your deposition back in November, I asked you what had made things change, and you never mentioned this lawsuit, this divorce in that whole deposition. You gave me a bunch of reasons that you said business was down. You never mentioned this ankle bracelet or this order of protection, did you? Five hours of deposition testimony you never brought that up, correct?

A. I never brought up the fact that I was -- that she filed for divorce?

-11-

Q. No. As I understand your direct testimony, you said one of the reasons business was down was because of this ankle bracelet and this order of protection.

A. Correct.

Q. What I'm saying, in November of 2016, when I took your deposition for hours --

A. Uh-huh.

Q. -- I asked you the very specific question, in your opinion, why is business down --

A. Uh-huh.

Q. -- after you had testified business was down, and you said, oh, clients get old, you know, they die. Never once did you mention -- and I gave you more than one chance -- did you mention that business was down because of this ankle bracelet or this order of protection, did you?

A. I may not have mentioned all the reasons. I thought I had the main ones, and those were additional reasons.

\*\*\*

Q. All right. I'll pull your deposition testimony in a minute on that issue, but let me ask you, what you've been doing is using your business income and your credit cards to pay these lawyers instead of paying child support or paying other bills for the benefit of the family, right?

A. Well, I paid child support starting, whatever it was, October or November, and I paid a $5,122 special payment that Judge Hollingsworth ordered me to pay in October, I addition to $1,000 alimony. So you'll see that -- I'm not sure about the timing of these things. I think what you're going to find is that I simply ran out of money, and that during the time frame, that I ran up $8,000 of credit card debt. So during that time is a pretty close match between -- before I started paying child support, it was a pretty close match between the debt I incurred and the legal expenses that I incurred.

Q. And yet you're asking for Mrs. Robbins to pay half of the credit card expenses that you've run up from whatever you've been doing?

A. I didn't do anything. I've had no golf memberships, nothing expensive in my life during the entire last 15 years. It was all for the family, everything I saved and earned over my career. I wasn't a big spender. I didn't have big hobbies. I lived as cheaply as I could. And I never wanted to incur big spending on houses and cars. Those were Sandra's ideas and initiatives, and I agreed to . . . .

-12-

The Trial Court questioned the Children in chambers in the presence of the guardian ad litem and a court reporter. Wife's counsel and pro se Husband were not present in chambers for the questioning, although they were permitted to submit questions beforehand. The Children's testimony was transcribed and sealed. Neither party is privy to the Children's testimony.

In June 2017, the Trial Court entered its order of divorce in which it incorporated its detailed memorandum opinion, a permanent parenting plan, and division of assets and liabilities. In its thorough memorandum opinion, the Trial Court found in relevant part:

> These parties were married April 19, 1996 making this a marriage of 21 years at the time of the hearing. There were three children born of the marriage, one of whom is now an adult. The other two children are Ava . . . and Theodore . . . . The only litigation involving the minor children other than this cause involves an order of protection which was entered against defendant Robert Scholze Robbins and in favor of Sandra Jo Robbins and the two minor children. That petition for order of protection arose out of a February 6, 2016 incident. The petition for order of protection was granted after consideration by Judge Hollingsworth. A domestic assault charge was brought before General Sessions Court also. On March 3, 2016, the General Sessions Court entered a suspended sentence with a no contact order and batterer's intervention treatment as conditions. After a finding of a violation, a GPS monitoring device was added, the suspended sentence was extended with Mr. Robbins on house arrest, and the no contact order was extended. Since that time, he has had no contact with the children. By order entered August 31, 2016, the mother was permitted to relocate to Michigan. She and the children have done so.
>
> The Court first will address the parenting plan issues between the parties. The Court is guided in its custody analysis by T.C.A. 36-6-106 and other applicable law. In this case, the Court must determine the custody arrangement that the Court determines is in the best interest of the minor children, considering the various statutory factors.
>
> The Court interviewed the two children in chambers. The Court, in 22 years on the bench, has not spoken with two teenagers who were as appropriate, intelligent, well-spoken, clear in their thought process, and mature as these two young people. Ava and Theo had no pretense to them. They were very articulate and sincere in their testimony. Their father had requested they speak with the Court or be put on the stand and interrogated. Because of the domestic violence history of this case and the findings of this Court concerning the incident giving rise to the order of protection, the Court found it appropriate to speak with the children in chambers in the

-13-

presence of a court reporter. The Court found both children to be very credible. The Court is aware of Mr. Robbins' contention that the children have been "brainwashed" by their mother and that the information they gave the Court would not be truthful. The Court found no evidence of such "brainwashing." The Court found the children to be straightforward in their testimony and they specifically denied any influence on their testimony by either parent.

Based on the Court's discussions with the children and all of the evidence in the case, the Court finds the strength, nature, and stability of each child's relationship with the mother is substantially stronger than with the father. Mrs. Robbins holds a substantially greater past and potential performance of parenting responsibilities. Because of the domestic violence findings, she is reticent to permit an ongoing relationship between the father and the children, believing that contact would be emotionally disruptive for the children. The domestic violence incident and the father's alcohol use has alienated the children from their father and significantly impaired the father/child relationship. The Court finds it in the best interest of the children for the mother not to require greater contact with the father than what is in each child's comfort zone. Based on Mr. Robbins' violation of the order of protection and other orders of this Court, the Court finds he is not likely to honor and facilitate court-ordered parenting arrangements and rights.

Both parties have attended the parent education seminars.

The mother is working in the bakery at a Wal-Mart in Michigan in order to provide the children with food, clothing, medical care, education, and other necessary care. The father refused to pay the tuition for the schools the children had planned to attend. However, the Court recognizes there may be a valid financial reason for that refusal. The child support for the children was deferred at the time, the order of protection was entered but Mr. Robbins was ordered to pay some expenses.

The mother has been the primary caregiver of these children, having taken the greater responsibility for performing parental responsibilities.

There is a strong bond between each child and the mother which evidences their love, affection, and emotional ties to her. The children are not bonded with the father. The father's actions have severed that bond.

The children have many family relationships in Michigan where they have now moved. They interact with those family members on a regular basis. On the father's side, the children have much family as Mr. Robbins was one of several siblings. Many of those still live in Chattanooga. Historically, the children have seen that family on holidays. The mother's family is in Michigan and the children have become involved satisfactorily

in that environment. The oldest sibling is in college in Michigan. They are very happy in school in Michigan and have adjusted well. They have extracurricular activities which they find satisfying.

The father's permanent parenting plan asks the Court to order the children back to Chattanooga. If the Court were to require the children to come back to Chattanooga, it would disrupt the continuity in their lives. They have been in a stable and satisfactory environment in Michigan since August of 2016. They are making excellent grades and are very close to each other. The school system is strong. Theo is participating in the same athletic endeavors he participated in at Baylor and Ava is excelling in French and heading up the French Club. Judge Hollingsworth has already found the relocation was reasonable and not vindictive. Mrs. Robbins would have been unable to successfully provide for the children without the support of her family in Michigan. On the issue of continuity and stability, it is important to note that the family only moved to Chattanooga in 2013.

There is finding of physical abuse perpetrated by the father on Ava and emotional abuse perpetrated by the father on both children. The alcoholism which afflicts Mr. Robbins has had a significant negative impact on both children as evidenced by their testimony and Exhibits 1 and 33.

There is no evidence concerning the behavior of any other person who resides in or frequents the home of either parent. The Court finds the children's preference reasonable and each child clearly prefers their mother have custody.

The mother's employment schedule is more erratic than that of the father and not as flexible as his. However, the mother lives in the same state as the children and is readily available to them.

The Court finds custody of these children must be with the mother. To rule otherwise would not be in the children's best interest and would clearly inflict additional pain and emotional distress on the children with no positive results.

The Court now must adopt a permanent parenting plan which is in the best interest of the children.

The mother has introduced into evidence two permanent parenting plans. Both parenting plans provide that until the criminal charges are resolved, there should be no parenting time by the father with the minor children. Exhibits 3 and 32 differ in the child support provisions. The Court will address the child support provisions and make findings in that regard when the Court addresses income in this Opinion.

The Court finds Exhibit 1 shall be adopted as the permanent parenting plan with the exception of the income findings and child support

calculations of paragraph III.A. The father shall pay 50 percent of uncovered medical expenses. Further, paragraph I.B is modified so as to permit the children to contact the father at their discretion. They will initiate the contact and Mr. Robbins is enjoined and prohibited from contacting them. He may, however, write letters to them and entrust those letters to one of his brothers who will hold them until and if they are requested by either or both of the children. The guardian *ad litem* shall advise the children of this provision. If one or both expresses a desire to receive the letters, the mother shall so inform any brother holding such correspondence and may obtain them and give them to the children. Further, if the children wish any contact with their relatives on their father's side of the family, they may initiate such contact. The father's side of the family may indicate an interest in interacting with the children by contacting the mother. However, this contact shall not be on behalf of the father.

The Court finds the motion to extend the order of protection shall be denied based upon the restrictions contained in this permanent parenting plan.

The Court now will address the income of the parties. It is clear that the financial posture of this family has changed markedly over time. Mr. Robbins' business is in financial capital management. With the downturn of the economy, there was a downturn in his business also. The family had been living a very comfortable lifestyle. The children were being educated in and had the anticipation of continuing to be educated in expensive private schools. They lived in a very nice house on Signal Mountain. Mrs. Robbins had been a stay-at-home mother for most of the marriage. Mr. Robbins had been responsible for all of the income and the expenses of the family. With the downturn in the economy, there also was a decrease in the earnings of Mr. Robbins. According to the family's individual tax returns, the income declined from gross wages of $134,066.00 in 2011 to $30,000.00 in 2014. The Court does not have the benefit of the 2015 and 2016 individual tax returns. The corporate returns reflect a change in gross income of $378,208.00 in 2011 to $139,720.00 gross receipts in 2015. The average income of Mr. Robbins reflected on the individual tax returns over four years is $71,000.00, or $5,918.00 per month. This calculation is inconsistent with Exhibit 11 which shows defendant Robbins' statement of gross total monthly income as $13,930.00. Exhibit 11 shows Mr. Robbins' contention as to his income before the expenses of RCM are deducted from the RCM fees is $8,283.00. Yet on his income and expense statement filed October 7, 2016, the income sworn to is $15,226.67. The evidence also establishes that he had advised Mrs. Robbins through the years that his

-16-

business was worth in the area of $400,000.00. The Court finds credible his contention that his income has decreased substantially because of the stock market and other factors. His wife and children all are drawing Social Security because of his age. The Court also finds credible Mr. Robbins' contention that this litigation has impacted his ability to earn. However, the Court also finds that once Mr. Robbins' focus is off of this litigation and is returned to his business, he will recoup some of that ability to earn. Accordingly, the Court finds his income for child support purposes to be $14,000.00 per month.

The Court finds the income of Mrs. Robbins is generated by her work at Wal-Mart in the bakery and by which she receives because of the Social Security benefits based on her husband having qualified for Social Security. The Court finds the gross income of Mrs. Robbins for child support purposes to be $800.00 from Walmart plus $642.00 from Social Security. Therefore, for purposes of the child support calculation her income is $1,442.00 per month. The Court does not find credible Mr. Robbins' contentions that Mrs. Robbins can earn $50,000.00 to $100,000.00 a year as a paralegal. It has been many years since she worked as a paralegal and common sense dictates that her skills have atrophied. Additionally, the practice of law and the way and manner in which paralegals are utilized have changed substantially through the years. Therefore, the Court does not find that she can supplement her earnings as a paralegal.

For purposes of child support, there are no work-related child care expenses or recurrent expenses that should be included in the child support calculation. The mother shall provide insurance for the children at a cost of $317.94 per month. For the purpose of child support, Mr. Robbins' numbers of days shall be reflected as zero and Mrs. Robbins shall be 365. The children draw Social Security benefits off of Mr. Robbins so the child support worksheet shall reflect a credit of $1,273.00. The Court also rejects the contention of Mr. Robbins that he should have a credit based on the children's ability to earn. This position is not substantiated by the law.

Counsel for Mrs. Robbins is ORDERED to prepare a Child Support Worksheet using these findings.

The Court now moves on to the division of assets and liabilities. In the division of assets and liabilities, the Court is guided by T.C.A. 36-4-121. The Court first is required to determine what property is marital and what property is separate. The Court finds the following assets are separate property:

Plaintiff's Separate Assets   Value

Wedding Ring   $36,500.00[2]
Miscellaneous Jewelry   $400.00
Pensco IRA/Vanguard IRA (Liquidated Rvest Shares. Transferred to Vanguard)   $12,822.33

Total   $49,722.33

Defendant's Separate Assets   Value
Cartier Santos Watch   Unknown
Coin Collection   $200.00
Stamp Collection   $100.00
½ Silver and Flatwear (Scholze silver)   $2,250.00

Total   $2,550.00

The Court further finds Robbins Capital Management holds a significant value still despite Mr. Robbins' contentions. However, the Court finds it is no longer worth $400,000.00 as contended by Mrs. Robbins. The Court notes Mr. Robbins values his business on Exhibit 12 at $600.00. The Court finds this simply is not credible and values the business at $250,000.00. The Court further finds that the Rvest IRA has been diminished by withdrawals by Mr. Robbins and the monies were used for family purposes. Remaining is $11,000.00 equity.

Upon an assessment of the credibility of the witnesses, the Court finds Mrs. Robbins' credibility substantially greater than that of Mr. Robbins. The Court finds Mr. Robbins' analysis is clouded by emotion and by a belief that his recollection of events is accurate to the exclusion of any other analysis. The evidence of his alcohol consumption is substantial and that very well may be playing a part in his inability to accurately recall the events. The Court does not find he is intentionally misrepresenting anything and finds he is a man who is attempting to do what is right. However, his analysis simply is flawed.

The Court, therefore, finds the valuations in Exhibit 5 and the division of assets and liabilities as amended by this Memorandum Opinion to be an appropriate division of assets and liabilities. The Court finds that Mr. Robbins' protestations about the incurring of medical bills on behalf of the children are not well based. The Court also finds credible Mrs. Robbins' statements that she does not have the items he has not reclaimed.

_____

[2] In handwritten notes on the order of divorce, the Trial Court stated that "the memorandum opinion is amended . . . to value the rings at $39,500 . . . ."

Any items she has which he claims are missing, she shall return to him. However, the Court finds credible that they are not in her possession. Payment to make the division equitable in the amount of $50,000.00 shall be made by Mr. Robbins to Mrs. Robbins.

The Court does ORDER the Christmas ornaments to be divided equally. Mrs. Robbins shall divide them and have one-half of them delivered to Mr. Robbins. The Court specifically finds the wedding ring and bands were gifts to Mrs. Robbins and not an investment. Those rings are valued at $39,500.00 (two bands and one engagement ring) and are separate property of Mrs. Robbins.

The alimony analysis is problematic. Mr. Robbins clearly has a substantially greater ability to earn than does Mrs. Robbins and his current earnings are substantially greater than hers. However, he also is being assessed with a substantial amount of debt. T.C.A. 36-5-101 addresses alimony. There is a clear preference for alimony which is rehabilitative or transitional in nature as opposed to alimony *in solido* or alimony *in futuro*. This is a situation in which the Court finds transitional alimony is not appropriate as Mrs. Robbins cannot be rehabilitated so that her earning capacity can even begin to approach that of Mr. Robbins. The transition necessary for the wife and children has already taken place. That transition, however, has not been able to be effectuated in a way which would eliminate her need.

The Court finds, pursuant to T.C.A. 36-5-121, that Mr. Robbins has a substantially greater earning capacity, financial resources, and income from other sources. His education is substantially greater than that of Mrs. Robbins. It is unrealistic to think that either will obtain additional education and training so as to improve earning capacity. This is a marriage of 21 years duration. Mr. Robbins is 70 years of age but certainly does not appear to be of that age and, other than as commented previously in this Opinion, he has retained the mental condition to do his job. He called two witnesses who are well acquainted with him who substantiated his strengths and he has the support of his family members. There was no evidence of any deterioration in physical condition of either party. It is desirable for both parties to seek employment outside of the home. The separate assets do not obviate the need in this case and the Court finds the division of marital property to be equitable. The standard of living established by the parties during the marriage was substantially greater than it is now. However, the standard of living of Mr. Robbins has diminished as has that of Mrs. Robbins and the children. The deterioration in the wife's and children's standard of living is starkly contrasted to Mr. Robbins' standard of living. Both parties made substantial contributions to

-19-

the marriage. The Court finds the fault in this case rests with Mr. Robbins and his alcohol abuse which skewed his ability to communicate effectively and appropriately with his family. His demands for his wife to obtain employment were inconsistent and unrealistic. The Court does find the financial stresses on this family are what ultimately resulted in the divorce but it is the way and manner in which each party handled those factors that resulted in the divorce. The Court has equitably divided the assets and is taking into consideration the Social Security benefits available to each party.

Accordingly, the Court finds this is an appropriate case for alimony *in futuro*. The Court ORDERS alimony *in futuro* of $1,200.00 a month, recognizing this in no way meets the identified and reasonable needs of Mrs. Robbins but also recognizing Mr. Robbins presently is not earning at his maximum potential.

The Court finds the parties have stipulated they are to be divorced pursuant to T.C.A. 36-4-129.

The Court finds there is an arrearage for child support and alimony in the amount of $743.00 and for car related expenses of $1,377.00. Judgment is entered for $2,120.00

The costs of this cause are taxed to Mr. Robbins for which execution may issue, if necessary, and the Court ORDERS Attorney Lawrence to submit an affidavit of attorney's fees, recognizing that the attorney's fees will be substantially greater than either party probably can afford for the substantial and necessary work she has done on this case.

After entry of the order of divorce, the Trial Court entered an order denying Wife's request for attorney's fees. The Trial Court also entered a domestic relations order. Husband timely appealed.

### Discussion

Husband, pro se, raises 18 separate issues on appeal along with a 16-part "summary of arguments." We restate and consolidate Husband's litany of issues into the following dispositive issues: 1) whether the Trial Court erred in its valuation, classification and division of marital property; 2) whether the Trial Court exhibited disqualifying bias against Husband; 3) whether the Trial Court erred in admitting the video of a family confrontation into evidence; 4) whether the Trial Court erred in declining to allow Husband to question the Children; 5) whether the Trial Court erred in adopting the permanent parenting plan; and, 6) whether the Trial Court erred in granting Wife alimony in futuro, and in the amount it did. Wife raises her own issue of whether she should be granted her attorney's fees incurred on appeal.

-20-

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). As our Supreme Court has instructed regarding witness credibility:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

We first address whether the Trial Court erred in its valuation, classification and division of marital property. As noted by this Court in *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 WL 47944, at *4 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed*), when dividing marital property:

> The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163] at 168.... In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

A trial court, therefore, has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991).

Critically, Husband failed to include in his appellate brief a table of the property or debt at issue. Rule 7 of the Rules of the Court of Appeals provides:

(a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

(b) Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

(c) If counsel disagrees with any entry in the opposing counsel's table, counsel must include in his or her brief, or in a reply brief if the issue was raised by opposing counsel after counsel filed his or her initial brief, a similar table containing counsel's version of the facts.

Rule 7 then gives an example of the type of table that is to be provided by the parties. As to the consequences of an appellant's failure to comply with Rule 7 where applicable, we have stated:

[W]here an appellant fails to comply with this rule, that appellant waives all such issues relating to the rule's requirements. This Court is under no duty to search a trial court record in order to discern the valuation of the couple's property. This Court has previously found issues involving the valuation and division of property waived for failure to comply with Rule 7.

*Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010) (citations and quotation marks omitted), *no appl. perm. appeal filed*.

Husband's failure to include a Rule 7 table is not the only deficiency with his brief. Husband lays out no standard of review. Husband only sporadically cites to legal authority. Most of Husband's arguments are mere conclusory assertions. As we have warned repeatedly:

Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. *See State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); *Rampy v. ICI Acrylics, Inc.*, 898 S.W.2d 196, 210 (Tenn. Ct. App. 1994); *State v. Dickerson*, 885 S.W.2d 90, 93 (Tenn. Crim. App. 1993). Moreover, an issue is waived where it is simply raised without any argument regarding its merits. *See Blair v. Badenhope*, 940 S.W.2d 575, 576-577 (Tenn. Ct. App. 1996); *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 86 (Tenn. Ct. App. 1988).... As noted in *England v. Burns Stone Company, Inc.*, 874 S.W.2d 32, 35 (Tenn. Ct. App. 1993), parties cannot expect this court to do its work for them. This Court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in the brief. *Duchow v. Whalen*, 872 S.W.2d 692, 693 (Tenn. Ct. App. 1993) (*citing Airline Const. Inc., [sic] v. Barr*, 807 S.W.2d 247 (Tenn. Ct. App. 1990)).

*Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000).

A Rule 7 table is especially important because, in the final analysis, what we are concerned with as to property division is the overall division of the marital estate and whether that division is equitable. Husband simply itemizes various funds, properties and debts and takes issue with the Trial Court's findings with respect to each. As an appellate court, we review trial courts' decisions for error; we do not conduct new trials on appeal, nor do we tweak divisions of marital estate piecemeal.

This Court may suspend the requirements of its rules for "good cause." *See* Tenn. R. Ct. App. 1(b). We find no such good cause here. We, therefore, find waived all issues raised by Husband with respect to the valuation, classification and division of property, as well as debts, and affirm the Trial Court as to this issue.

Despite the deficiencies of Husband's brief and, mindful of his pro se status, we proceed to consider his other issues with the next being whether the Trial Court exhibited bias. "All litigants have a right to have their cases heard by fair and impartial judges." *Davis v. Tennessee Dept. of Employment Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999). "Parties who challenge a judge's impartiality must come forward with some evidence that would prompt a reasonable, disinterested person to believe that the judge's impartiality might reasonably be questioned." *Id*. "The alleged bias or prejudice of the judge, moreover, must come from an extrajudicial source and not be based on what the judge see or hears before him." *In re C.T.S.*, 156 S.W.3d 18, 23 (Tenn. Ct. App. 2004).

Essentially, Husband's argument is that the Trial Court was biased against him because the Trial Court disbelieved much of his testimony and largely ruled against him. This, of course, is not what judicial bias is. Judges, in the course of what they see and hear before them, routinely make rulings adverse to parties. That is the essence of a trial judge's job. That is very different from being predisposed to rule against a party for some outside reason. In addition, even if the Trial Court erred in some respect as indeed we go on to find it did here, that is not necessarily a product of bias either. It is simply an error.

Nothing the Trial Court said or did in the present case could reasonably be construed as demonstrating improper bias against Husband. Indeed, the Trial Court in its memorandum opinion stated that it believed Husband had the right motives even if his arguments were unconvincing. This issue is without merit.

We next address whether the Trial Court erred in admitting the video of a family confrontation into evidence. We review evidentiary rulings of the trial court for abuse of discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999). Husband contends that "it was highly altered and edited -- was incomplete and inaccurate -- from its continuous original cell phone recording into about a dozen discontinuous segments" and that "the only segment showing contact between Ms. Robbins and me began at the point of my outstretched arm, which was in fact my feeble attempt to defend my shoulder's from postsurgery 3-6 weeks earlier, so Ms. Robbins could and did approach me 'rabidly', so I did not approach her, but had asked 'Who threw me.'" The following exchange occurred at trial:

> Q. And let's play the video, since there's been some question about it -- it's very short -- of the incident where you said in your deposition you were just being a good father.
> MR. ROBBINS: I object to the video, Your Honor. It's not the true rendition that was taken on a cell phone. It's highly edited. It's in segments of -- at least the one I got, which is supposed to be the true copy that they included in the discovery. These are about ten to 20 segments, and almost all of them are exactly 12 seconds each. They are not one continuous flow. They may have deleted some. They may have edited some of them. It has to be edited. It's not the true event. My daughter doesn't have a 12-second clock. These are discontinuous videos that don't represent what happened. The numbers or labels on the video are not continuous. There's no explanation as to why any of this is so highly edited. And the critical segment that shows some contact does not show what happened immediately beforehand. And the audio goes in and out.

THE COURT: Ms. Lawrence, foundation?

MS. LAWRENCE: Yes. I can put -- I don't know what was said with the children.

THE COURT: I'm getting ready to address that, but what is your foundation?

MS. LAWRENCE: Okay. My client can testify that she was there and that the video has not been edited. Mr. Robbins knows this. The daughter, Ava -- and I know nothing from what she said back there -- but the daughter, Ava, had her cell phone on, and in between all these skirmishes, she's trying to video. There's no question --

THE COURT: Okay. I can put on the record that there has been some discussion with the children and the Court about the video, and they testified it had not been edited and that it was accurate. Now, you may -- your objections will go to credibility and to the weight of the video, and the Court notes your objections, it notes that you believe it to be an incomplete and inaccurate video. Okay?

MR. ROBBINS: Yes, Your Honor.

We have reviewed the video. The video depicts Husband and his family yelling and screaming at one another. It is a regrettable scene. While the video is discontinuous as Husband asserts, it does not appear to be edited in any other fashion. If nothing else, the video is additional evidence of the unfortunate breakdown in the family relationship. We find no reversible error in the Trial Court's discretionary decision to admit the video.

We next address whether the Trial Court erred in declining to allow Husband to question the Children. The Trial Court questioned the Children in chambers in the presence of the guardian ad litem and a court reporter but not Wife's counsel or Husband who was acting as his own counsel. In *Rutherford v. Rutherford*, 971 S.W.2d 955, 956-57 (Tenn. Ct. App. 1997), we discussed the requirements for questioning a child outside the courtroom setting:

> The Trial Judge has discretion to interview children apart from the courtroom setting if he considers it is in the best interest of the child. However, if he elects to follow this procedure, he must examine the child "in the presence of attorneys for each side and in the presence of the court reporter" *Newburger v. Newburger*, 10 Tenn. App. 555, 566 (1930), and in order to have a complete record on appeal, a transcript of such evidence must be filed.

In *Haines v. Haines*, No. E2005-02180-COA-R3-CV, 2007 WL 27112, at *7 (Tenn. Ct. App. Jan. 4, 2007), *no appl. perm. appeal filed*, we held that: "[T]he right to have counsel

physically present during a trial court's interview of a child is a substantial right, implicating, as it does, a litigant's right to due process."

In the somewhat more recent case of *Maxwell v. Woodard*, No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at *18 (Tenn. Ct. App. May 31, 2013), *no appl. perm. appeal filed*, we looked favorably upon a trial court's decision to exclude parents from the room while the child testified, stating: "The GAL told the trial court that the parents' presence during testimony would make the child deeply uncomfortable, and the trial court wisely chose to exclude the parents from her chambers during Maxwell's testimony." However, in *Maxwell* as opposed to the present case, "[t]he trial court began by hearing Maxwell's testimony in chambers, *with counsel* and the guardian ad litem present . . . ." *Id.* at *2 (emphasis added). The trial judge and guardian ad litem proceeded to question the child. *Id.* at *3-4.

The following exchanges occurred at trial relative to this issue of the Children testifying in chambers:

> MS. LAWRENCE: And we do have a stipulation, I think, to have the children go ahead and, as you requested, testify, and so the guardian doesn't have to spend all day here at an added expense. Is that correct?
> MR. ROBBINS: That's agreeable, yes, Your Honor.
> THE COURT: All right. Then I would like each of you to give to the guardian a list of the areas of inquiry, and he and I will meet with the children in chambers with the court reporter, and I will talk to the children in private, with the guardian ad litem and the court reporter.
> MS. LAWRENCE: Okay.
> MR. ROBBINS: I didn't know that was going to be the format, but I think I can accommodate it, Your Honor.
> THE COURT: That is the customary way it is done, and it's not discretionary with you, sir, it's discretionary with me.
> MR. ROBBINS: I didn't understand your prior comments. Okay, Your Honor.

> ***

> THE COURT: Thank you, sir. All right. As I understand it, it's the parties' request that I talk to the children now. I will talk to them separately. Mr. Neal, I will let you make the determination with whom I will speak first, so if you will meet me in chambers with one of the children. And do you each have questions you want me to look at?
> MR. ROBBINS: Yes, Your Honor.

-26-

THE COURT: Hand them to my court officer, please.

Initially, we recognize that the Trial Court took steps to ensure fairness to the parties and proper procedure. The record contains a sealed transcript of the Children's testimony in chambers, which facilitates appellate review. The Trial Court also invited the parties to submit questions. Nevertheless, we are troubled by the Trial Court's decision to exclude Wife's counsel and Husband, acting pro se, and the attendant due process implications.

This is perhaps an unusual scenario. Given Husband's history of domestic assault, the Trial Court understandably was hesitant to subject the Children to his interrogation. We do not take issue with the Trial Court's decision to not permit Husband to directly question the Children. To that extent, we disagree with Husband's argument on appeal. However, Wife's counsel and pro se Husband were not in the same room as the Children during their testimony, and the Children's testimony subsequently was sealed.

The Trial Court found that it "has not spoken with two teenagers who were as appropriate, intelligent, well-spoken, clear in their thought process, and mature as these two young people." Having read their testimony, we see how the Trial Court arrived at this assessment of the Children's intelligence and maturity. The Children's welfare is of course a high priority, but the due process rights of the parents may not be ignored either.

As a result of the procedure adopted by the Trial Court, the parties had no access to or knowledge of the Children's testimony. It was sealed and made unavailable to them but was considered by the Trial Court. Although Wife's counsel and pro se Husband were allowed to submit questions beforehand, that is no substitute for being there. Wife's counsel and Husband perhaps could have supplemented their questions in response to the Children's testimony by submitting additional questions in writing to be asked by the Trial Court. At the very least, they would have known what was being said by the Children and considered by the Trial Court in a case in which the parents' as well as the Children's interests were at stake. We hold that the Trial Court erred in excluding Wife's counsel and Husband, acting as his own counsel, from chambers during the Children's testimony or, at a minimum, providing some method for Wife's counsel and Husband, pro se, to be able to observe the testimony live from a location other than the Judge's chambers.

Our holding that the Trial Court erred, however, does not conclude our analysis. Not all error is reversible. Rule 36 of the Tennessee Rules of Appellate Procedure provides that a final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The Trial

Court clearly relied on a host of other testimony and evidence in arriving at its conclusions regarding parenting. We hold that the Trial Court's error in questioning the Children outside of the presence of Wife's counsel and Husband, pro se, or in the alternative, providing some means for them to observe the Children's testimony live was error but, under these circumstances, not reversible error. This additional testimony and evidence as already discussed in the Opinion more than preponderates in favor of the Trial Court's findings relevant to the issue of parenting.

Having resolved the prior issue concerning the questioning of the Children, we next address whether the Trial Court erred in adopting the permanent parenting plan. As our Supreme Court has instructed:

> A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Armbrister v. Armbrister*, 414 S.W.3d at 693 (citing *Eldridge v. Eldridge*, 42 S.W.3d at 88). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d at 88).

*Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

When making a determination in a divorce proceeding regarding custody of a minor child, a court is to consider the factors contained in Tenn. Code Ann. § 36-6-106, which provides, in pertinent part:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The

-28-

court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a

qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (2017).

This Court, in a series of cases, has stated that the parental relocation statute, Tenn. Code Ann. § 36-6-108, is not to be applied when a court is making an initial permanent custody determination as is the situation here. *E.g., Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549 (Tenn. Ct. App. March 6, 2013), *no appl. perm. appeal filed*; *Nasgovitz v. Nasgovitz*, No. M2010-02606-COA-R3-CV, 2012 WL 2445076 (Tenn. Ct. App. June 27, 2012), *no appl. perm. appeal filed*. Furthermore, the parental relocation statute itself provides that it is to be applied "[a]fter custody or co-

parenting has been established by the entry of a permanent parenting plan or final order, ...." Tenn. Code Ann. § 36-6-108(a) (2017).

The Trial Court made detailed findings, quoted above. In particular, the Trial Court found that the Children were happy and well-adjusted to life in Michigan. Husband's assertions that the Children were brainwashed by their mother were rejected by the Trial Court. We defer to the credibility determinations of the Trial Court absent clear and convincing evidence to the contrary, and here we find no such evidence to the contrary. The permanent parenting plan entered by the Trial Court is indeed highly restrictive toward Husband, providing in part: "Father shall not exercise parenting time with the minor children until all criminal charges against him regarding domestic violence are resolved, and then only professionally supervised visitation on every other Sunday from 2:00 to 4:00 p.m." The evidence does not preponderate against the Trial Court's findings. We affirm the Trial Court in its formulation and entry of the permanent parenting plan as being in the best interest of the Children.

We next address whether the Trial Court erred in granting Wife alimony in futuro, and in the amount it did. As our Supreme Court has instructed:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce ... the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor...."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a

decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) ). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson,* 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 350 S.W.3d 105-06 (Tenn. 2011) (footnote omitted).

Here, Husband correctly points out the preference in Tennessee for rehabilitative or transitional alimony over alimony in futuro. However, the Trial Court's detailed findings, supported by the evidence in the record, reflect that Wife is hugely disadvantaged economically with respect to Husband and cannot be rehabilitated. Although the parties may never re-establish the standard of living they enjoyed at the financial height of the marriage, Wife's need for support is significant, and Husband has the ability to earn and pay said support. The Trial Court rejected Husband's oft-repeated contention that Wife could earn $50,000 to $100,000 as a paralegal. As the Trial Court found, that is not realistic. Wife, entering her 60s, was a stay-at-home mother for two decades. Wife requires significant ongoing assistance. As with the other issues on appeal insofar as the Trial Court declined to credit Husband's testimony, we find no evidence rising to the level of clear and convincing to overturn the Trial Court's credibility determinations. We affirm the Trial Court's award of alimony in futuro at the rate of $1,200 per month.

Finally, we consider whether Wife is entitled to an award of attorney's fees on appeal. In the exercise of our discretion, we decline to award either party attorney's fees incurred on appeal. We affirm the judgment of the Trial Court.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Robert Scholze Robbins, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE